I would just roll through with the three, I think those seated have been here before so you know the rules in terms of the lights and so forth. I would just ask you to keep your voices up and stay in the microphone so we can hear you well, particularly if you're answering a question so that all of us can hear the responses to it. With that said, we'll call up the first case, United States v. Martinez, Mr. Moreno. Mr. Moreno. Yes, sir. May I approach? Certainly. May it please the court? Yes, sir. Your Honor, Ms. Crystal Martinez was charged with possession with intent to distribute and conspiracy to possess with intent to distribute methamphetamine. At trial, the evidence established that the methamphetamine in question was disguised as commercial soaps and laundry detergents. It was disguised to the extent that the law enforcement officers at the scene were not able to identify the presence of drugs simply on view. What they had to rely on to identify that there were drugs present was their extensive legal training and scientific testing. When you say soap, are you talking about boxes of laundry detergent? What did it look, what did they say? It was bottles of laundry detergent and bars of soap, and the bars themselves were constructed to where it appeared to be soap, but it was methamphetamine. How big were they? I believe it was just a regular bar of soap. Like bath soap? Yes, sir. It seemed that way, Judge. Yes, Your Honor. I was curious about that as well. Were they carved out or hollowed out or what? I'm not sure how it was made, but what I understood from the trial testimony was that it appeared to be a bar of soap, but if you broke it or carved into it, it was a volatile substance that could be dangerous to handle that way. And so it appeared on site to be soaps, commercial soaps and laundry detergents. And as I stated, the officers on the scene needed to rely on their extensive experience regarding drug trafficking and also on scientific testing to determine that there were drugs present. If you, I'm sorry to interrupt again, but these are real unusual facts to me, 115 kilos of meth? Yes, Your Honor. I mean, that's, you know, 250 pounds, perhaps? It was large bags, it was large quantities, the vehicle was full. I mean, and what kind, it was a sedan, right? I believe so, Your Honor, yes. So the trunk must have been packed. It was packed, Your Honor. Good grief. Yes, Your Honor. And the story that was given- A lot of downy fabric softener. And the story that was given at the checkpoint was that the driver was going to open a laundromat and that's why there was such a need for a large quantity of commercial soaps and detergents. And at trial, Ms. Martinez's defense was knowledge. Knowledge that there were drugs present in the vehicle and knowledge of an intent to possess with intent to distribute these drugs. Is your point that it was so obvious that there were drugs in the vehicle that they didn't need to bring in past history? No, Your Honor. Well, my point simply in this opening stage is that it was so disguised that the defense of knowledge was a viable defense for Ms. Martinez. That might have been true, except that they made a dry run the day before with nothing in the vehicle. Your Honor, what we argued at trial was that it was not a dry run. What we argued at trial was that there was a run the night before, that there were soaps and detergents in the vehicle, ostensibly, but that it may have been drugs. We don't know because my client was told the same story the night before she was told the day they were arrested, is that... She knew she wasn't opening a laundry business. I'm sorry, Your Honor? She knew she wasn't opening a laundry business. We believe that the driver knew she wasn't opening a laundry business, Your Honor, but our defense was that my client was informed that that's in fact what they were doing. And so when she went along for the ride, she was going along to pick up laundry soaps so they could open up a business, and she was going to be an employee, Judge. That was her story. That's what she told the agents at the time of arrest, and she never wavered from that. The co-defendant changed her story, and she wavered from that, and she changed her story multiple times, Your Honor. What did they do with the laundry detergent after the dry run? That was a question that we raised at trial. The co-defendant never told the agents what she did with those bottles of soap and the bars of soap. My client said that they took them to the co-defendant's house. As far as she knows, that's where it stayed. The agents never recovered it, and we asked them if the co-defendant, on trial and cross-examination, we asked the agents, did she ever tell you where the soaps were at, and she never did. She never told them up until perhaps a month later where the soaps were at, and at that point nobody went to go look for it. Our point at trial was that we believe that the co-defendant got away not only with a lighter sentence, but also with a previous load of drugs that she was able to somehow distribute. And it went to the credibility of the co-defendant, and that's why we brought up those issues at trial, Your Honor. What's the difference, I mean, in the sense that it's a full-blown jury trial. There's nothing you're arguing to us that wasn't argued to the jury, etc. So that, while it may be plausible what you're arguing, but if the jury didn't accept that version given the way this was packaged, etc., and if they did find it was a dry run, that, in other words, where's the reversible error? Even though the theory may be plausible, but it's a jury-tried case, so go ahead. I'm sorry, Your Honor. No. We don't know whether the jury thought it was plausible because the government brought in evidence of extrinsic offenses that were unrelated to this offense. We believe that the co-defendant's credibility was such that the government believed they needed more evidence. And what more evidence they had was my client's extrinsic offenses. The extrinsic offense was bulk cash smuggling. What the government did at trial- I mean, did the government have any evidence of any knowledge that if they hadn't had the 404B, there's no way she could have gotten convicted? We believe that that's possible, Your Honor. We believe that that's on point, and we believe that if it weren't, then the evidence of 404B extrinsic offenses was not even necessary. Well, a lot of times, 404B may not be, quote, necessary, but it's not unusual that prosecution will offer the 404B. You don't argue that they didn't follow BCHM, etc., etc. You're arguing basically that it's more harmful or prejudicial than it was probative. But that didn't get you over the hump, per se, whether they need it or not. I mean, it's the prosecutor's charge, they put it in, etc. But you sort of got to convince me that the government's case otherwise was just absolutely so weak, so implausible, that this evidence is what tipped the scale. Your Honor, we believe that the government did not follow BCHM. We believe that in order for BCHM to apply, as this court is well aware, extrinsic evidence is admissible in certain instances. In instances where the extrinsic offense is similar to the offense charged, the trial court found that the extrinsic evidence was not similar. The trial court, however, gave the government leeway to establish a predicate for admissibility of the evidence. In their predicate, the government argued, well, drugs typically go up and money typically comes down. And that was the extent of their predicate. As this court is well aware, the extrinsic evidence has to be relevant to an offense, I'm sorry, relevant to an issue other than character for committing these crimes. Well, seeing that it's relevant, it just seems to be your strongest argument is that this evidence is dissimilar. It is dissimilar, Your Honor. It seems like that's your strongest argument, is that it's dissimilar, that in the BCHM cases, if it's probative, it's more probative if it's dissimilar, but that this is dissimilar. I mean, that strikes me as your strongest argument. I'm not saying that's your prevailing argument, but that, from what I got from the briefs, seems to be the most potent argument that it's sufficiently dissimilar. That's correct, Your Honor. Our argument is that it is dissimilar. However, the government is arguing that since the government at trial laid the predicate that drugs go up and money comes down, that essentially Karina Martinez's testimony, that's my client's sister, was drug testimony. However, that's a mischaracterization, Your Honor, because there was never any indication that the bulk cash smuggling was related to any violation of federal narcotics rules. And so at that point, we believe, Your Honor, that the extrinsic offense is so that at trial for the case that was charged. Additionally, Your Honor- Were you the trial counsel? I was, Your Honor. I was, Your Honor. I'm not sure. I mean, I hear the way you're saying it. I don't think it's a relevancy issue as much as, you know, in the balance is the inflammatory nature of it outweigh any probative value that it is. I mean, to me, it is relevant. That's either here or there, but I- And in the balance, Your Honor, I believe that bringing up- Was there a motion in limine proceeding on the Beecham evidence? Yes, Your Honor. There was a motion in limine whereby I objected to the introduction of extrinsic evidence. The court informed the government that she was inclined, the trial judge was inclined to not allow the extrinsic evidence because it was dissimilar. And that's where I'm referring to, the trial court found that it was dissimilar to the offense charged. However, as I stated before, the trial court gave the government leeway to establish a predicate for why the evidence could be determined to be similar or relevant to this case. And I believe that that introduction of evidence failed and that it did not establish that the prior bulk cash smuggling offense was related to any drug or narcotics violation. They didn't prove that on every occasion that money goes up, there's a bulk cash smuggling offense that comes down. They didn't prove that on the prior bulk cash smuggling offense, for which my client was not convicted, she was not even charged, that that particular bulk cash smuggling offense was related to a drug issue or drug. Couldn't people also, I mean, it was her sister who testified about that, right? Yes, Your Honor, that's correct. So apparently she put her sister in jeopardy, if you believe her sister's testimony. Yes, Your Honor, that's correct. Is it possible that some people on the jury could think that these sisters didn't get along? I suppose that's possible, Your Honor. Discount the testimony to some extent. I suppose it's possible to make the connection that since she's there testifying that trial and because the sister was convicted of the offense, that there was some sort of animosity of judge. But my client, Crystal Martinez, was never charged with that offense. And as I informed the court, she was never given an opportunity to accept or deny in court the charges against her. What was Trevino's sentence? Trevino's sentence, I believe, Your Honor, was six years, but I'm not 100% sure. It was in the six or seven year range. Six years versus 20 years? Yes, Your Honor, that's correct. But Trevino pled guilty, I suppose. Yes, Your Honor, she pled guilty. And my client had a criminal history there. No, the criminal history is what made the difference. It affected the guideline range. Even if she had pled guilty, she would have been looking at the same guideline range, I believe, Your Honor. Because she had some prior state cases. Other than the extrinsic offenses that was introduced at trial. And again, Your Honor, on top of the fact that the government introduced extrinsic offenses, on testimony from Ms. Trevino, I'm sorry, from Ms., yes, from Ms. Trevino. The government listed a testimony that my client has an extensive criminal history. As I stated before, the co-defendant changed her story various times. At one point, she said that she was working alone and that Ms. Trevino had nothing to do with it. And then she changed her story and said she was going to pay my client. Yeah, but that's all credibility. Yes, Your Honor, that's all credibility. But at one point, when they asked her, well, why did you change your story? She said, because I didn't want Ms. Martinez to take the blame, because she has a lot of history. So on top of hearing the fact that this extrinsic offense that my client- I thought there was an objection and instruction not to consider that. There was an objection, Your Honor, and there was an instruction from the court. I thought the court did not consider that. Yes, Your Honor, but we believe that even with the instruction, and I moved for a mistrial. However, the record did not reflect that I moved for a mistrial. But I believe that even with my objection, even with the limiting instruction, hearing the fact that my client has an extrinsic offense that was admitted and offenses that were not necessarily admitted but were referred to, that unduly prejudiced my client. Does this come down to a harm analysis? Yes, Your Honor. My client's rights to a fair and impartial jury were harmed because the government was allowed erroneously, I believe, to discuss extrinsic offenses that are not related to the offense charged. And because the government elicited testimony from the co-defendant that my client had an extensive criminal history. And therefore, we believe that her right to a due process of law was violated because she was not able to get a jury trial. Whereby she was charged only, for she was convicted only on the evidence of the offense charged. Additionally, Your Honor, her right to a fair and impartial jury, her right to have the government prove the case against her beyond a reasonable doubt, the burden was shifted to her than to prove. She does have these extrinsic offenses, and she does have this extensive criminal history. But in this instance, she was not acting in conformity with her character. And so we believe that the government unduly shifted the burden to my client, and we believe she was harmed. These are constitutional rights, Your Honor, and constitutional rights, as this court knows, are substantial rights. And violation of these rights cannot be considered harmless. We're asking this honorable court to reverse the trial court's judgment and to remand the case for a new trial. All right. Thank you, Your Honor. All right, Ms. Wilson, you're up. There are a lot of places you could start, but why don't you start with the 404B. I mean, you acknowledge it is or was dissimilar in that sense, right? Yes, I will start with the Beecham. The government believes that both prongs of Beecham were easily satisfied. Intent is always an issue, as the court knows, in a drug trafficking case. And here, by Martinez's not guilty plea, she put her intent in issue. When that occurs, this court has held repeatedly the admission of extrinsic evidence is justified. And it satisfies the first prong of Beecham. I understand the court's concern, or Judge Stewart's concern, about the dissimilarity. But here, we had Agent Gallegos prove up that connection. He talked about, starting on page 700 was his testimony, that in trafficking cases, how drugs are moved north and the proceeds are moved south. The court initially was not inclined to allow this testimony. And it was only after Agent Gallegos testified that she allowed, that the court allowed the testimony of Martinez's sister, Diana. She testified, Diana, that three or four times, Martinez had directed her to pick up money in Corpus Christi and then move it back to Matamoros. It is correct that there is nothing in the record that Martinez was charged with this crime. If she'd been arrested for that. Correct, but that did not come in before the jury. I'm just saying, if she had been arrested for that. If, I'm sorry. If she had been arrested for that, that arrest wouldn't come in, would it? Well, again, excuse me. There are cases where this court looks at the conduct, not necessarily rest just on a conviction. The cases are replete with bad acts as well as prior conviction. And here, the evidence was offered for the non-character purpose of proving Martinez's knowledge and intent as well as motive. And this court has held that where motive is involved, excuse me, the offenses don't even have to be similar. They can be dissimilar. But the evidence was also probative of Martinez's knowledge of the narcotics industry. And what we have here is her not guilty plea. We have the defense counsel attacking Trevino's credibility at trial. And we also have it compounded by asking and arguing agents, you only know what Trevino told you. And that scenario is like, for example, this court's decision in Cockrell, which is cited in the brief. And there- Well, let's talk about that you only know what Trevino told you statement. That had to do with this transaction, right? That's correct. And so what he knew about another transaction is not relevant to this. That's not even a pertinent response. I don't see how that opened the door. You're talking about he being- When the agent said, all right, the agent was asked the question, you only know what Trevino told you, right? Correct. Meaning, in context, about this crossing, this particular- Martinez's knowledge or intent or involvement in the drug transaction. Yes. And so I'm not sure how it opened the door to say, well, you could know a lot of things about her as an agent that are not responsive to that question. But that's not, it does not seem to me that that question gives you the right to dump everything you know into the record. Well, remember, Trevino's a co-conspirator. And in Cockrell, you had a similar situation. Most of the witnesses were co-conspirators and many had immunity or plea agreements. And here, Trevino also had a plea agreement, which was discussed at trial. And the defendant repeatedly used that situation to attack those witnesses' credibility. And this court found that given Cockrell's choice to defend in this manner, the court didn't abuse its discretion. And the same scenario exists here. Trevino wasn't tried with Martinez. I mean, the only incident that was at issue was the crossing with the drugs, not the prior bulk cash transfers. Correct. I still have a hard time seeing when you're asked, you only know what Trevino told you, would bring in what Trevino told him about the bulk cash transfer. But that was secondary to the issue of Martinez not pleading guilty. And by doing that, she opened up her, excuse me, her intent. Well, that's a separate- Correct. I'm just talking about, I'm focusing on, did you open the door? But the prosecutor initially was arguing that it went to her intent, her knowledge, and her motive. And then was also arguing about the opening of the door in the second go-round. Because if you recall, in the first go-round, she says that she, the prosecutor says that she wants to put on Diana. The judge said no. And the judge says, no, these offenses don't seem similar. So if, my point is, I'm not sure you have a valid second leg. I'm not sure the defense counsel did open the door. Well, even if this court's not inclined, it's still her knowledge and her intent justifies the admission of the extrinsic evidence, based on the fact that she put her knowledge, motive, and all of that in dispute. I understand your argument, I'm just saying that they're two distinct arguments, it seems to me. Right, but the prosecutor argued that secondarily. And also, this court, essentially, the government needed that or wanted that evidence to corroborate Trevino's testimony, right? Because what we had is all the evidence regarding Martinez's intent and knowledge and what have you, aside from the circumstantial evidence at the bridges, came from Trevino. And a couple things I want to clear up that were discussed during defense counsel's presentation. And one is, and I'm not saying he misspoke or anything, but just so this court understands is, they do the dry run with a bunch of downy and soap. And they come to the bridge at night, Martinez is driving Trevino's car that time. And they get sent to secondary, and the dog alerts to the vehicle, but not to the drugs, I'm sorry, not drugs. Not to the downy and soap that had been removed. And there's some testimony which is then disputed that one of them had told the agent that they had been smoking pot in the car, and that's why the dog alerted. But the second day, Trevino's driving her sister's Tahoe. When they go with the 72 bottles of downy, the 148 bars of the Zoet soap, and then the 25 bars of the non-drug soap. The drugs were in the blue soap, the non-drugs were in the pink soap. So I just wanted to clear that up. But this court has also said, you have to, in weighing the probative value of all of this evidence, is look at everything. Look essentially at a common sense assessment. And here the court was very cautious in exercising its discretion. As we already discussed, the court wasn't inclined initially to allow it. And then after Agent Gallegos decided that that would be appropriate. But even then, the court instructed the jury before Diana, the sister, even testified. And then in accordance again, once again with this court's pattern instructions, instructed the jury again in the jury charge. So the court's actions, to the extent this court thinks that there was a problem, it mitigated, if not eliminated, any alleged prejudice. That instruction's a little bit confusing because it says you can't use it to decide if she committed the crime, yet you're supposed to use it to decide an element of the crime, which is knowledge. I'm sorry, can you say that again? It's confusing to me because the judge says, under no circumstances are you to use this evidence to decide guilt, whether she did it. But they're supposed to consider it as the knowledge aspect, which is an element of the crime. It's confusing. Well, but she follows 404B in terms of you can use it for knowledge, intent, motive, and that type of thing. Which is an element of guilt. I'm just, it's inherently conflicting. But there was also no objection. And I think the court was trying to be very cautious and to make sure that the jury followed 404B in conjunction with the applicable law. But even if this court is inclined to find that there was error, it was harmless. What we have is not only the agent's testimony and Trevino's testimony, which of course turned on credibility, right, as set forth in the briefs. Trevino contradicted herself all over the place. But she was clear that her former, I guess, best friend was involved in this. They contrived a story on their way to the bridge. Trevino had broke open one of the soaps and had shown Martinez the crystals. She also, sorry, Trevino also had opened a downy and had showed Martinez how there were crumbs in the downy. Also, when they were in the Matamoros picking up the drugs, apparently there was a discussion in that house about the drugs and Martinez was right there. And all of that, of course, is set out in the brief. So in addition to those testimonies, we also have the text messages from Martinez saying she wanted to work because she needed cash, cash, cash. And coupled with the district court's instruction, any error was harmless. In relation to his other, defense counsel's other issue, what happened there was the prosecutor asked the question of Trevino, why did you want to protect Martinez? And Trevino is the one that answered because Martinez had a lot of record and she didn't want her, Trevino didn't want Martinez doing a lot of time. Defense counsel immediately objected and before the government could even respond, the district court was instructing the jury and gave an even stronger instruction than defense counsel had requested. And this court repeatedly has held that any type, these type of instructions cure any error. And it's particularly warranted here where Martinez hasn't made a serious effort to show otherwise. So unless the court has any additional questions, the government would conclude the district court did not abuse its discretion and this court should affirm it. The only question I have about that is why, Trevino's being put on as the prosecution's witness. Why did they ask that question at the end there? Why were you trying to protect Martinez? I don't know, Your Honor. I just read the record, I can't explain, I have no idea. It was just a follow-up question. I don't think there's anything in the record to indicate that it was calculated or contrived or anything like that, but as I said, the district court immediately issued an instruction to the jury. Right. Thank you, Ms. Wilson. All right, back to you, Mr. Marino, if you have a rebuttal. Your Honor, may I proceed? Yes. Your Honor, just a couple of things. I know the government expressed to the court, explained to the court, that on the night of the alleged dry run, that the canine alerted to the vehicle and not to the packaging, the laundry soaps and detergents that were pulled out of the vehicle. There was testimony to that regard at the trial that it's possible, it's potentially a situation where the canine is trained to seek drugs in the vehicle. So he might have smelled the drugs and he's alerting to the vehicle, while the whole time there's drugs in the packaging behind him. But his training is that there's drugs in the vehicle and he's alerting to the vehicle. At trial, before trial, at the time of arrest, the defendants were asked, why was the dog alerting to the vehicle, and there was a response to, well, we were smoking marijuana. That led to one of the inconsistent statements from the co-defendant, Mr. Avino, who testified, I never told the agents anything about marijuana, I don't smoke marijuana. Even in that regard, her testimony was not consistent. She informed the agents on the evening of arrest that her initial statement was that we do, I am going to start a business. I did inform my friend that we're going to start a business. They had an exact location. It's at so and so shopping strip by the T-Mobile store or the Boost store. So they had, she had a story exactly where her business was going to be. And at trial, our defense was that that's what she told my client as well. There was an objection, not specifically to the jury instruction regarding the 404B evidence. The objection was to the 404B evidence being introduced at all. After that, my objection had been overruled. At that point, it's coming in and the judge is going to give an instruction. My objection was on the record, that I believe that those extrinsic offenses were dissimilar. The court found that they were dissimilar. And even in the government's predicate for admission of the evidence, there was no indication that that bulk cash smuggling case became a similar offense to an offense. What's your response to the government in meeting the point you're raising that we have cases dealing with beachroom evidence that have allowed dissimilar conduct in the scenario where intent is there, etc., etc., etc. So I'm just asking, what's your rebuttal? I understand your argument. She kind of argues that in this context and in some others, yes, the general rule of similarity, but that we do have cases where the evidence was dissimilar, if this, if that. There was no if this or that, Your Honor. The government's intent at trial was to- Are you saying we would be breaking new ground if we found, A, there was no error because the evidence was dissimilar. You're saying we have no cases that have, I mean,  Your Honor, I believe that this, that the government is asking the court to expand the law as it currently stands to include offense that are dissimilar and then that have no connection to the charged offense. Well, is bulk cash contraband? Bulk cash is contraband, Your Honor. Are drugs contraband? Drugs are contraband, Your Honor. We're talking about illegal border crossings with contraband. Yes, Your Honor, we are. However, as the trial court pointed out, the intent to commit the violation of bulk cash smuggling and the intent to commit the violation of narcotics laws are different intents. Well, they are, but it's axiomatic that Beecham evidence is not, quote, identical. I mean, it's sort of the nature of it. It's not identical. It's similar, and so you got this balance between how dissimilar can it be, how probative, et cetera, et cetera. Now, we could draw a continuum where it's so off the map that it has absolutely no relevance, but in the scenario of border crossing, illegality, transfer, et cetera, we don't have any cases that says it has to be identical. So then the question is, you know, in this crucible, you know, is it sufficiently similar or not so dissimilar given the overall context that it's reversible error? That's why I asked you, okay, what's your best case in a dissimilarity context that would say we have no choice following precedent to reverse? Your Honor, I'm out of time if I may be. You're never out of time to answer my question. It just doesn't work. I believe that it is so dissimilar that it's irrelevant. I believe that argument, Mr. Munoz, Ms. Martinez. I'm not trying to get you to abandon your argument. I'm just giving you the benefit of just the thought that, you know, I'm not asking you to abandon the argument that you made. What I was really trying to get you at was if you cite me a case that, you know, was more, at least from your argument given what's here that we ought to be sure to look at. I mean, we're going to look at the cases. No, no, I believe in Jackson. I cited Jackson in my brief. The court found that the case that's extrinsic needs to be strictly relevant to the case. As charged. And there's a, they discussed one of the cases whereby the charged offense and the extrinsic offense were not inextricably intertwined. And therefore, it should not have come in, Your Honor. And I believe that these two cases were not inextricably intertwined and should not have come in, Your Honor. That was a strong ending, Counsel. Thank you, Your Honor. You did well. That's all I have, Your Honor. May I be excused? All right. Thank you, Mr. Morito and Ms. Wilson for the briefing and argument. The case will be submitted. All right.